IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Steven S. Brown,                      :

            Plaintiff,         :   Case No. 2:13-cv-0006

   v.                          :   JUDGE GEORGE C. SMITH
                                   Magistrate Judge Kemp
Director Mohr, et al.,         :

            Defendants.        :

<u>REPORT AND RECOMMENDATION AND ORDER</u>

     This prisoner civil rights case is before the Court to
consider several motions.  They include a motion for judgment on
the pleadings filed by defendants Dr. Krisher, Insp. Whitten, Mr.
Heiss, Mr. Seacrest, Warden Jeffries, DW Upchurch, and Ryan Dolan
and a motion to dismiss filed by Director Mohr.  Plaintiff Steven
S. Brown has also filed several motions including a motion to
"reserve" defendants, a motion for an order to serve Nurse Smith,
a motion to amend the complaint, a motion seeking a an order to
"reserve" defendants Stout and Trout, and a motion to appoint
counsel.  Defendants also have filed a motion to stay discovery
and a motion for an extension of time to file a reply in support
of their motion for judgment on the pleadings.  For the following
reasons, the Court will recommend that the motion for judgment on
the pleadings and the motion to dismiss be granted in part and
denied in part.  The remaining motions will be resolved as set
forth below.

I.  <u>Background</u>

     This case has been pending for more than three years.  The
Court has detailed its somewhat tortured history in previous
orders and will not repeat it at any length here.  For ease of
reference and to provide clarity, however, the Court will restate

the remaining allegations of Mr. Brown's complaint in light of the Court's most recent Report and Recommendation (Doc. 139), which was adopted and affirmed by order dated February 2, 2016 (Doc. 154).

Briefly, the Report and Recommendation struck many of the allegations of Mr. Brown's third amended complaint and allowed Mr. Brown to incorporate by reference several of the allegations of his original complaint as transferred here from the Western Division. Further, the Court limited the complaint's temporal scope to events which occurred between Mr. Brown's transfer to RCI on January 18, 2011 and his transfer out on April 6, 2011, and between his return to RCI on March 15, 2013, and the date his motion for leave to amend was filed, which was August 26, 2013. Mr. Brown's operative complaint, as it currently stands, includes the following allegations from the original complaint, stated here verbatim:

> 12) The C/O upon arriving at Ross gave the plaintiff all his non-carry medication which included narcotics. His nazi celly ended up stealing them along with much of the plaintiff's other property.
>
> 13) When the prison authorities found out that they had given the plaintiff the narcotics they had his cell searched but could not find them so they put him in the hole.
>
> 14) They transfered him a few hours later to a hospital cell and in the morning he saw a doctor named Dr. Krishner. This Doctor stopped all plaintiff's medication including pain medication, insulin, seizure medication, vitamine D and other medications. Plaintiff was told that by the doctor that he was under instruction by Central Office to cut costs and to stop prescribing pain medication. This doctor also stopped a previous order for a consult with a neurologist and for a c-pap machine for sleep apnia.
>
> 15) As a result of this denial of the plaintiffs right to medical care and medication he had seizures, suffered extreme pain, and complacations from sleep

-2-

apnia including high blood pressure and mental health
problems.  He also suffered high blood sugars and his 3
month A1c was over 9.

16) When the plaintiff was released from the hospital
unit and he went to get his property he found that much
of his property was missing and his legal papers were
destroyed.  The property officer refused to acknowledge
that the property was missing and tried to force the
plaintiff to sign the John Doe C/O refused to let him
have the rest of his property.

17) The plaintiff went in serch of a supervisor and
found Warden Jefferies.  He tried to explain about the
property, his nazi celly and the denial of medical
care.  The warden refused to allow the plaintiff to
explain and started yelling at him about him being out
of place.  In frustration the plaintiff said "what kind
of place are you running here."  For that he was taken
to the hole.

18) In the hole he was put on the top floor and top
bunk.  Due to the doctor stopping high doses of sizure
medication the plaintiff had a seizure and fell from
the top bunk hurting his back, neck and arm.

19) The plaintiff had a pivious order to be housed on
the bottom bunk and on the bottom range but Dr.
Krishner did not renew it.  The plaintiff told the
nurses including nurse Smith but they refused to put
him in a safe place.

20) The plaintiff was moved to another cell closer to
the medical department.  This cell had a shower in it
and no ventilation.  Thus the whole cell was covered in
black mold.  This mold made the plaintiff sick.  The
cell was also full of flys and fly larve (black worms),
growing in stgnant water.  The plaintiff was not given
enough food and his diabetic snack was canceled so he
could not take his insulin.

21) The plaintiff complained about these conditions to
the warden, deputy warden, health care administrator
and inspector but he received no relief.

22) The plaintiff continued to suffer in pain,
seizures, and from sleep apnia, He then got a 105
temperature and was returned to the hospital unit and

placed in a cell with no heat by Nurse Smith.  He was
not given his blood pressure and heart medication.  He
threatened to sue the nurse and she said, you cant sue
if your dead a lot of good the money will do you in
prison.  The plaintiff replied how about if I use it to
hire a private detective to see what could be dug up on
you.

23) Plaintiff was moved out of the cell with no heat by
a nurse on the next shift and also given his
medication.  Nurse Smith had tried to kill the
plaintiff by denying medical care and medication and by
putting the plaintiff in a cell with no heat when it
was 12º outside.

24) Plaintiff made a complaint against Nurse Smith and
the next day she retaliated by writing a bogus tickit
saying the plaintiff threatened her.

25) Also in retaliation the RIB chairman found the
plaintiff guilty without allowing witnesses and
recommended that the plaintiff be sent to Lucasville-
higher security.  This was done several months later
under the orders of Warden Jefferies, attorney general
Dolan, Edwin Voorhies, Greg Trout, Austin Stout, Trevor
Clark and others.
...
27) Deputy Warden Upchurch refused to approve the
plaintiffs Kosher diet.  She also refused to provide
mental health care after the conditions made the
plaintiff go crazy and his mother died.

28) While being held in isolation the plaintiff's mom
became very ill and had to go to the hospital for
ovarian cancer.  They gave her a few weeks to live.
The plaintiff asked to be permitted to call her but
Warden Jefferies, Robert Whitten, and others refused to
allow him to call and say goodby.  Plaintiff's mother
kept calling out for him and to talk to him.
...
32) After the plaintiffs mother died he went crazy.  He
was kept in isolation, he was denied medical care,
mental health care, after passing out he was assaulted
by John Doe C/O's because he could not walk, he could
not sleep for days due to severe pain, sleep apnia, and
grief, remorse and anger at the prison authorities for

-4-

torturing him and not allowing him to go to the
funeral. The totally of his circumstances constituted
cruel and unusual punishment, denial of court access,
retaliation, withholding legal mail, destruction of his
property, deliberately putting him in a cell with a
nazi, denying kosher food, denying health care, denying
mental health care, destruction of his legal papers,
giving him bogus tickits and danying him due process in
his disciplinary hearings. Those responsible for these
acts at Ross Correctional include, Mary Anne Reese,
Ryan Dolan, Greg Trout, Edwin Voorhies, Austin Stout,
Director Mohr, Warden Jefferies, Ms. Ward from Mental
Health, Mr Seacrest from mental health, Deputy Warden
Upchurch, Dr. Krisher, Inspector Whitten, C/O Riggs who
assaulted me, Lisa Bethel - health care adminstrator,
John Doe Dep. Warden of Operations for failing to
properly supervise his employees which harmed the
plaintiff and put him in unconstitutional conditions,
Lt. Yates for denying due process in RIB and for
retaliation, Gary Croft for retaliation and denial of
medical care and denial of court access, Mr Heiss for
illegally withholding legal mail, illegally destroying
legal documents, for retaliation for making complaints
of abuse, disciplinary issues and conditions and for
condoning the plaintiffs torture in the hole and
antisemitism by Ross staff.

33) The plaintiff was transferred back to Lucasville
and put in unconstitutional conditions by Ron Eleby and
Warden Jeffries. This move was in retaliation for
making complaints and partially caused by the
plaintiff's behavior when they tortured him at Ross
into insanity.
...

83) Plaintiff was transferred to Toledo where for 3
months there was no Doctor working here at all. This
was the directors fault, Mr. Mohr who is responsible
for providing a doctor. The plaintiff did not get
medications or care for serious illnesses including
diabetes, rectal bleeding, herniated discs, shoulder
pain and torn rotator disc, neuropathy, high blood
pressure, enemia, contractures, pereferal vascular
diseases and heart problems.

Further, the operative complaint includes the following
allegations from the third amended complaint, numbered

-5-

according to Mr. Brown and stated here verbatim:

1.  The plaintiff's security was dropped and he was sent to R.C.I. on 1-18-11.  Then he was returned to maximum security on 4-6-11.  He was again returned to R.C.I. on 3-15-13.

2.  On the way to R.C.I. on 1-18-11 the plaintiff was assaulted by C/O Riggs in retaliation for the plaintiff being a jail house lawyer.  When he struck the plaintiff he said "Here something to remember us by. This act violated the plaintiffs constitutional right 8th Amendment and 14th Amendment.

2.  Upon arrival at W.C.I. the plaintiff's legal documents were dumped and ransacked by a John Doe Leutenant.  Some were destroyed.  This was in retaliation for the plaintiff being a jail house lawyer and for filing lawsuits.  Some of the documents were destroyed along with his art supplies.  This act violated the plaintiff's 8th and 1st amendment rights.

3.  This same Lt. John Doe gave the plaintiff his dispenced only medication by mistake.

4.  The plaintiff is a conservative Jewish person.  He was put in a cell with a Neo-Nazi inmate.  This inmate took the plaintiffs, dispenced by nurse narcotic medication.  The pills were worth $2.00 a piece and there were about 100 pills.

5.  The inmate had pictures of Hitler all over the walls, swaztias tatooed all over him and said "he hates Jews and N[ ]."  By the Warden (Jeffries) and the John Doe cell assigner knowingly putting the plaintiff in danger violated the plaintiffs 8th and 1st Amendment rights an RLUPA.

6.  The nurses found the pills missing and sent C/O's to get them.  The plaintiff had not even unpacked.  He had been on the phone in the block while his celly was stealing the pills.  The C/O's searched the cell and when they could not find them took the plaintiff to the hole in the medical unit.

7.  The plaintiff was told his Nazi celly told them he had taken all the pills.  So he was put on observation in the medical unit.

-6-

8.  The next morning he saw the institutional doctor. Dr. Krisher stated since you misused your medication I'm discontinuing your Ultrim (a pain pill) and your Neurotin (a seizure medication used for diabetic neuropath).  The plaintiff was on the maximum dose of each medication.  He also stopped the plaintiff's insulin, Vitamin D, blood pressure meds and other medication.

9.  The plaintiff was released from the medical unit the next morning.  When he went to get his property half of his stuff was missing, that had been packed up by corrections officers.

10.  When the plaintiff said, he would not sign the property slip the C/O said "then you won't get any of your property," and will be punished for refusing to sign that you got all of your property."

11.  The plaintiff left the property room without property to find a supervisor.  He went to the Capt.'s office where he ran into Warden Jeffries.  He tried to explain all that had happened since he came to R.C.I. but the Warden refused to let him talk.  When the plaintiff said, that the doctor, Nazi inmates, and the denial of his seizure diabetes medication, and pain medication were going to put his life in danger and he would be liable he told Lt. to take him to the hole.

12.  In the hole the plaintiff had a seizure due to the abrupt withdrawal of his seizure medication, his pain medication, and insulin.

13.  He fell from the top bunk and injured his neck, head, shoulder and back.  At SOCF he had a bottom bunk, bottom range restriction but Dr. Krisher refused to renew that also.

14.  To cover up the Dr's deliberate indifference to the plaintiff's medical needs as claimed above the nurses and Dr. Krisher refused to provide medical care for the injuries from falling out of the bunk.

15.  The plaintiff was then put in an unheated cell in the medical unit.  It was 10º outside.  There were holes in the corner of the wall where air came in.  Due to this extreme cold the plaintiff got a 104º fever. He asked to be moved into a heated cell but Nurse Smith

refused. She also refused to give the plaintiff his
heart and diabetes pills saying Dr. Krisher did not
sign the order and refused to treat the plaintiff's
fever.

16. When the plaintiff complained Nurse Smith wrote a
retaliatory report saying that I had treatened her.
Which was a lie.

17. The next shift the plaintiff was moved into a
heated cell and given his medication.

18. Due to the plaintiff's complaints about the way he
had been treated at RCI by dening him medical care,
medication, safe conditions and his religious rights,
Warden Jeffries had his security raised.

19. After being released from the hospital unit and
not getting care for his injuries the plaintiff was put
in a supermax type cell in a section of the hole
reserved for super isolation. The conditions in this
cell and unit constituted cruel and unusual conditions,
to wit/ no ventilation, no windows, black mold, small
flys all over the cell (100's), cockroaches, maggots
growing in stagnant water, filthy walls with grafetti
and Nazi symbols all over the wall, no recreation, no
telephone calls, no books to read, excessive noise,
daily retaliatory cell searches, no legal documents
allowed. The conditions made the plaintiff psyically
and mentally ill due to being in there for 4 months. A
capt. who was gay would touch his private partes
everyday, wink at him and throw kisses at him.

20. The plaintiff complained of these conditions to
Warden Jeffries, Inspector Whitten, Mr Heiss, Mary Anne
Reese, Mr. Voorhies, Deputy Warden Upchurch, Mr.
Seacrest and Director Moore to no avail. He also
completed the grievance process and was denied relief
by L.C. Covel.

21. During this period of isolation the plaintiff had
3 active cases in court in which he was denied access
to by withholding his legal documents, dening access to
his appointed lawyer, dening access to a phone and
legal phone, refusing to give him legal mail and
discovery documents, to access a law library, to buy
stamps and legal supplies, his lawbooks and case law.
This denial of his right to access the courts and

O.D.R.C. administrators harmed his ability to seek help with his mistreatment at R.C.I. from his lawyer or the Ross County Courts, to provide documents in support of his habeas corpus that proved actual innocence of his crime, to pursue post conviction remedies, to make court deadlines in his civil rights case and due this total denial of his right to access the court finally signed under duress a settlement in Brown v. Voorhies (Cincinnati). This deliberate denial of court access and retaliation for seeking redress of the violation of constitutional rights was done by O.D.R.C. lawyers, Clark, Stout, Trout, Mary Anne Reese, Warden Voorhies, Warden Jeffries, Mr. Heiss, D.W. Upchurch, Mr. Heiss, Lt. Cockrel, Ryan Dolan, Director Moore and Mr. Whitten.

22. Even though the plaintiff had been approved for a kosher diet for year Deputy Warden Upchurch refused to approve this diet at R.C.I. even when the plaintiff went on a hunger strike. He was even punished for writing a grievance over this issue by Upchurch who is a antisemite.

23. While being held in isolation the plaintiffs mother became ill and put in Hospice with ovarian cancer. His sister and the hospice people had called and asked that the plaintiff be permitted to talk to her. She was begging to be allowed to say goodbye before she died. His sister wrote that she was in severe pain and constantly called out to talk to him. Warden Jeffries refused to allow the plaintiff to call. On 2-4-11 the plaintiff wrote a kite that said, "Sir, my mom is 80 and has cancer. Please allow me to call her. She cant write and she is to weak, I want to say good bye before she dies." "Thanks." Warden Jeffries responded in Large Red Letters, all capitalized, YOU WILL NOT BE PERMITTED PHONE PRIVELEDGES FOR THAT REQUEST AT THIS TIME. cc: Inspector.

24. In severe isolation the plaintiff was going crazy from worry about his mom, severe pain and diabetes complecations, insomnia from worry, pain and stress. Insomnia from sleep apnia. Stress from not being able to access the courts, withdrawal from seizure and pain med's and anger at being mistreated knowing and maliciously by Warden Jeffries, and others for daring to make complaints of unconstitutional treatment and retaliation.

-9-

25.  In frustration the plaintiff cussed everyone and went completely crazy.  He begged for help and was not given health treatment.  He wrote Mary Anne Reese, Mr. Voorhies, and Director Mohr begging for help.  None responded.  This torture continued in the form of harassment like making fun of my mom dying, tearing up my legal papers, spilling my food on the floor, refusing to give me medication, holding and destroying my legal mail.  The following did these things, Warden Jeffries, DW Upchurch, Mr. Heiss, Capt. Posey, Lt. Yates, UMA Pence, Mr. Seacrest, ODRC Lawywers Trout, Stout, and Clark, Warden Voorhies, Director Mohr, and Ryan Nolan.

31.  When the plaintiff complained that he was going crazy and could not get care, two days after his mom died Warden Jeffries had the plaintiff put in a suicide cell naked.  The plaintiff did not request this or threaten to kill himself.  This was done to make the plaintiff more miserable.  Warden Jeffries and some C/O's for 2 days came and taunted the plaintiff by asking if he wanted to call his mom now, the size of his penis, and we'll teach you to make complaints.  He received no visits by mental health personnel.  This placement was done to harass, humiliate and torture the plaintiff.

33.  The court in Columbus in Brown v. Voorhies appointed a lawyer to represent the plaintiff.  The plaintiff was supposed to sent the lawyer all his proofs and documents.  Ross Correctional Staff refused to allow the plaintiff to send his documents or even to bring them with him when the lawyers came to visit. They refused to allow the plaintiff to send out DVD's to be copied and sent back in.  They refused to give the plaintiff discovery that had been sent in by the defendants.  They were rude and nasty to the lawyer when he came.  This was done by Warden Jeffries, Mr. Heiss, Mr. Whitten and O.D.R.C. lawyers.

34.  In further retaliation the plaintiff was again transferred back to SOCF on 4-6-11.

37.  On 3-15-13 the plaintiff was transferred back to Ross Correctional.  Upon arrival Dr. Krisher again stopped the plaintiffs seizure medication, pain medication and canceled all the ordered tests fromm S.O.C.F. for his abnormal blood test, rehumtology,

-10-

colonoscopy and other tests. The plaintiff continued
to be sick. The severe, now untreated neuropath made
it impossible to walk sometimes. He could not go to
chow, programs or any where else due to the pain. He
suffered excessive pain from headaches from being
beaten. His neck was damaged with 4 herniated disc's
and vertibrea compressing his spinal cord. His blood
pressure and diabetes were out of control, he was
denied his c-pap machine for sleep apnia and suffered
sleep depravation from apnia and pain. His hands were
contorted with contractures, and arthritis, his kidneys
hurt from high blood pressure, joint damage in his
knees, elbows and feet.

38. There is no doctor who works at R.C.I. Dr.
Krisher supposedly supervises 2 nurse practioners names
Ms. Kardaras and Ms. Hawk but Dr. Krisher has A.L.S.
and is very sick. He does not supervise because he is
so sick. He goes to Thailand for "alternative
treatment" and I never saw him at Ross except 1 time.
Because he canceled all my tests, denied my previously
prescribed medication and refused to treat my serious
illnesses he and his nurse practioners were
deliberately indifferent to my serious medical needs, a
violation of my constitutional rights. The plaintiff
could not function and asked for Americans with
disabilities accomadations and was denied based on
report by Lisa Bethal.

40. The plaintiff was forced to refuse to go in his
cell so he could be put in isolation where his food,
insulin and medication could be brought to him. Due to
this he was denied access to a law library, programs,
jobs, commissary and exercize. This is a violation of
the A.D.A. and the 1st and 8th Amendments.

41. The plaintiff was previously approved to get
kosher food before being transferred to R.C.I. When he
got there he kited the chaplin and Rabbi, so he could
follow his religious laws by remaining kosher. Both
approved the kosher diet and informed Mr Ford the
kitchen manager to provide the diet. He refused. The
plaintiff filed complaints and finally after 4 months
of complaints Mr. Ford provided it. Then ARAMART
Corporation took over the food service. They cut the
portions, the quality of food, provided rancid meats,
cold and frozen food, unheathy prepackaged food full of
transfats, high salt, unheathy chemicals and unkosher

dishes.  The plaintiff, a diabetic with high blood fats and high blood pressure complained.  The institutional nutritionist agreed that the food was unhealthy and was damaging the plaintiffs health but stated the neither the local ARAMART representitives nor the local nutritionist could change the food that was approved by the administrative nutritionist in Columbus and ARAMART executives.  These John Doe defendants and Director Mohr are in violation of the plaintiff's constitutional rights upon the U.S. Constitution, state policy and state law that requires the Director or provide adequate food and is derelict in his duty.

44.  Through out his stay at R.C.I. the plaintiff was <u>deliberatly</u> celled in a 2 man cell with Nazi's, skinheads, and Christian sepratist.  This was done, knowing the plaintiff would live with these people and were knowingly putting the plaintiff in danger.  Many times his property was stolen and he was threatened into refusing to lock.

45.  Warden Oppi finally moved the plaintiff to the religious POD but he again was housed with a Christian Sepratist who believed that Jew's were the cause of every problem since the beginning of time and should be eraticated.  The plaintiff asked Sgt. Anderson to be moved.  Sgt. Anderson afer fold the plaintiff was Jewish and did not want to live with an anti-semite said, "Jews don't belong in the religious block, it's for Christians.  The plaintiff had to refuse to lock and again was punished.  When the plaintiff complained to Mr. Pence the Unit Manager, Sgt Anderson denied what he said.  The plaintiff complained to Mr. Heiss, and Warden Oppi about his saftey and the conditions but they ignored the complaints also Mr Byrd.

34.  At R.C.I. due to a unconstitutional property policy was not permitted to have all his legal papers.  This policy, that limits inmates from keeping legal documents and property over 2.4 cubic feet in there cell is unconstitutional when it prevents inmates from exercizing their constitutional rights to redress by making them destroy or send out proofs of their claims, discovery document necessary for appeal or any other document needed in any active case.  This denial and taking of the plaintiff's legal documents caused delay and the inability to file new claims over civil rights violation, post conviction petitions, appeals in the

Court of Appeal, probate issues, and also forced the
plaintiff to seek more time to file his pleadings in
Brown v. Voorhies that finally angered Judge Frost
enough that he dismissed his case.  The policy name is
61-PRP-01.

35.  The plaintiff was indigent and could not afford to
make copies or send legal mail. O.D.R.C. will not debit
an inmates account for copies or legal mail if he has
over $12.00 on his account in a one month period or if
he is indigent.  The indigent amount and the policy of
non debiting inmates accounts so he can meet deadlines
are both unconstitutional. (75-MAL-01, 59-LEG-01)
ODRC pays inmates $12.00 a month at least.  With this
money an inmate must buy hygiene items, paper, pens,
commissary items, laundry detergent, stamps, phone
time, medical co-pay, and other items.  This leaves no
money for copies and postage to access the courts.
Additionally, many inmates have money taken out for
court costs, child support, fines, restitution, and
victims compensation.  Even if an inmate is paid the
$12.00 and it is taken from him he is not considered
indigent.  Additionally, another unconstitutional
policy prevents the medical department from prescribing
over the counter medicine. (69-OCH-2).  O.D.R.C. is
mandated by the constitution to provide medical care.
Also in Ohio it is a criminal violation not to provide
medical care.  In the commissary for instance it costs
$15.41 for prilosec, $4.46 for laxitive so on.  I was
denied medication I needed for pain, stomach problems,
sinus problems, sinus problems, colds and other
problems because I was forced to choose between the
meidcation I needed or accessing the court.  When I was
enemic I could not buy vitamines.  Additionally inmates
are provided only 3 sets of clothes.  You must wash
these clothes by hand every 2 days in you sink.  The
clothes do not get clean or sanitized.  You must spend
$5.00 for laundry detergent.  O.D.R.C. is mandated by
the Constitution and Ohio law - (see Dereliction of
Duty) to provide inmates with clothes.  Thus the policy
of only giving inmate 3 sets of clothes in
unconstitutional.

Additionally it is very expensive to make phone
calls.  It is mandated by law that inmates have contact
with their families.

In totallity, the indigent amount is too low, when

-13-

you consider he has to buy all the above things and be
able to access the courts.  All inmates wheather they
are indigent or not should have their accounts debited
so they can access the courts especially when Ohio
courts will not excuse late filings and procedurally
bar your appeal which then bars habeas corpus review
and further post conviction in Ohio or delayed appeals
where the appellate courts apply res judicata.

        The plaintiff has been harmed by the above
policies where in Brown v. Voorhies, and in this case,
he could not serve defendants, in appeals that were
untimely with his probate issues, by not getting O.T.C.
medication and in Brown v. Voorhies where Judge Frost
became so mad that he dismissed the case.  Done by
Director Mohr.

36.  Since Director Mohr and Chief Medical Officer Eddy
have taken over the medical care, medication, access to
specialist care, access to institutional doctors,
access to over the counter medications have be cut.
Due to directives by Dr. Eddy the plaintiffs consults
that had been ordered by institutional doctor were not
approved.  These consults including an operation on his
broken orbital bone, colonoscopy, rehumatology consult,
hand clinic, neurologist for his neck, MRI on his neck,
diabetes consult, bone marrow biopsy, and pain clinic.
Additionally many of the plaintiffs medications were
discontinued because Dr. Eddy and Director Mohr took
them off the formulary.

37.  There is no doctor working at R.C.I.  Dr. Eddy
replaced doctors in many institutions with Nurse
Practioners.  At RCI, there are 2 nurses for 1400
inmates.  Many inmates suffer from delays, limitted
formulary and no over the counter medications.

38.  The plaintiff has serious medical problems
including diabetes, uncontroled high blood pressure,
high blood fats (lipids), cardiovascular problems such
as edemas, blockages in his heart, and arteries, severe
periferal neuropathies, cluster headaches, diplopias,
sleep apnia, rehumatoid artritus, nodules and growths
on his bones, 4 disc's in his neck that are herniated,
disc's that are deteriorated, disc's and vertebrea that
are compressing his spinal cord causing severe pain
down his shoulder and weakness in his arm and hand,
severe contractures in his hands along with severe

-14-

artritus and P.T.S.D. from being beaten and tortured
for years.

39.  Prior to the change of administration the
plaintiff was on 300 mgs of Ultram, 3600 mgs of
Neurontin, Niacine, Fish Oil, Vitamine D, and other
medications that completely controled his problems.
All these drugs were taken off the formulary.  The
Niacine and fish oil completely controled the blood
fats in fact they were low.  The Ultram controled the
severe neck pain and cluster headaches, the Neurontin
controled the neuropath well.  Since these policys and
administrator changed I have been assaulted severely 3
times.  Each time the E.R. doctors ordered MRI's of my
neck, neurologist consults, an operation on my broken
orbital bone and when my blood values were messed up
specialist care.

40.  For that including a colonoscopy for a bleeding
rectum, rehumatoligist, hemotologist and neurosurgeon.
Dr. Eddy denied all these tests.  The plaintiff has
suffered severe pain that has effected his sleep and
mental health.  He has deteriorated and lost 50 lbs at
Ross.  Even though the institutional personel stated to
me that they were prevented by policy and Dr. Eddy from
giving me medical care they are responsible.

41.  The plaintiff claims that Director Mohr and Dr.
Eddy have instituted policies and procedures that have
harmed my health, caused me to suffer severe pain and
prevented me from seeing a doctor and getting
medication due to the limitted formulary.

In addition to these allegations, Mr. Brown's third amended
complaint, in its claims for relief section and stated here only
as it relates to the remaining defendants in this case, indicates
that he is pursuing the following claims against the following
individuals:

1.  A denial of access to the courts claim against
Director Mohr, Mr. Stout, Mr. Trout, Mr. Clark, Mr.
Dolan, Warden Jeffries, Mr. Heiss, and Inspector
Whitten.

2.  A claim for deliberate indifference to his serious
medical needs against Director Mohr and Dr. Krisher.

-15-

3.  A claim for unconstitutional policies relating to medication and access to medical specialists against Director Mohr.

5.  A claim for violation of his right to practice his religion against Dirctor Mohr and Mr. Heiss.

6.  An unconstitutional conditions of confinement claim against Warden Jeffries, Insp. Whitten, Mr. Heiss, Assistant Director Voorhies and Mr. Clark.

7.  A claim for retaliation against Dr. Krisher, Warden Jeffries, Nurse Smith, Insp. Whitten, Mr. Heiss, Assistant Director Voorhies, DW Upchurch, Mr. Seacrest, Director Mohr, Mr. Clark, Mr. Stout, and Mr. Dolan.

## II.  Motion for Judgment on the Pleadings

### A.  The Motion

Defendants Krisher, Whitten, Heiss, Seacrest, Jeffries, Upchurch and Dolan have moved for judgment on the pleadings, contending that, at the time of filing, they "are the only defendants who have been served and/or have not been dismissed by the Court."  In their motion these Defendants assert that Mr. Brown is not entitled to injunctive relief because he no longer is imprisoned at the Ross Correctional Institution.  Further, they contend that any claims against them in their official capacities are barred by the Eleventh Amendment.  Finally, they contend that they are entitled to qualified immunity on Mr. Brown's remaining claims.

The moving Defendants interpret Mr. Brown's complaint as raising nine specific allegations of unconstitutional conduct and categorize these claims individually, based on Mr. Brown's paragraph numbering in the third amended complaint, as follows:

1.  Allegation One: Warden Jeffries violated Brown's 1st and 8th Amendment and RLUIPA rights by putting him in a cell with a Neo-Nazi inmate (¶5).

2.  Allegation Two: Dr. Krisner violated Brown's 8th Amendment and ADA rights with medical indifference

-16-

(¶¶ 8,12,13,37, 38).

    3.  Allegation Three: Defendant Jeffries retaliated against Brown (¶¶11, 18, 31).

    4.  Allegation Four: Conditions of Confinement in the supermax cell against Jeffries, Whitten, Heiss, Upchurch, and Seacrest violated the Eighth Amendment (¶¶19-20).

    5.  Allegation Five: Denial of access to courts by withholding legal documents and mail, denying access to court-appointed lawyer, denying access to the phone, denying access to a law library, denying stamps and legal supplies, denying a pen and paper, denying law books by Jeffries, Heiss, Upchurch, Dolan, Whitten (¶¶21, 33).

    6.  Allegation Six: Defendant Upchurch violated Plaintiff's First Amendment right to the free exercise of his religion by denying him kosher meals (¶22).

    7.  Allegation Seven: Defendant Jeffries refused to allow Plaintiff to speak to his dying mother in violation of the 8th Amendment (¶23).

    8.  Allegation Eight: Defendants Jeffries, Upchurch, Heiss, Seacrest, and Dolan violated Plaintiff's Eighth Amendment right to be free from torture (¶25).

    9.  Allegation Nine: Defendant Heiss violated Plaintiff's Eighth Amendment rights because he ignored Plaintiff's complaints about his safety and the conditions at RCI (¶45).

Mr. Brown responded to this motion on June 3, 2016. This filing takes issue with every point raised by the Defendants. Mr. Brown addresses the claims identified by the Defendants and sets forth the paragraphs of the third amended complaint he believes support each claim. He also offers a detailed discussion of how these claims are not subject to dismissal. The Court notes that, in their briefing, neither Mr. Brown nor Defendants refer to the allegations of the original complaint by

-17-

paragraph number.  As a review of those allegations indicates, however, they overlap with, and appear to be encompassed by, the allegations of the third amended complaint.

In their reply, aside from restating their original positions, Defendants assert that Mr. Brown has improperly attempted to raise new claims in his response.

### B.  Legal Standard

A motion for judgment on the pleadings filed under Fed.R.Civ.P. 12(c) attacks the sufficiency of the pleadings and is evaluated under the same standard as a motion to dismiss. Amersbach v. City of Cleveland, 598 F.2d 1033, 1038 (6th Cir. 1979).  In ruling upon such motion, the Court must accept as true all well- pleaded material allegations of the pleadings of the opposing party, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment.  Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 479 F.2d 478, 480 (6th Cir. 1973).  The same rules which apply to judging the sufficiency of the pleadings apply to a Rule 12(c) motion as to a motion filed under Rule 12(b)(6); that is, the Court must separate factual allegations from legal conclusions, and may consider as true only those factual allegations which meet a threshold test for plausibility.  See,e.g., Tucker v. Middleburg-Legacy Place, 539 F.3d 545 (6th Cir. 2008), citing, inter alia, Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Further, as always, pro se complaints are to be construed liberally in favor of the pro se party.  See Haines v. Kerner, 404 U.S. 519, 520 (1972).  It is with these standards in mind that the motion for judgment on the pleadings must be decided.

### C.  Analysis

The Court will turn first to Defendants' argument that any claims for injunctive relief must be dismissed because Mr. Brown is no longer housed at RCI.  The Court agrees.  See Kensu v.

Haigh, 87 F.3d 172, 175 (6th Cir. 1996)("to the extent [plaintiff] seeks declaratory and injunctive relief his claims are now moot as he is no longer confined in [that] institution").

Additionally, to the extent that Mr. Brown is suing any of these Defendants in their official capacities for money damages, such claims are barred by the Eleventh Amendment. "To state a claim under §1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." Salehpour v. University of Tennessee, 159 F.3d 199, 206 (6th Cir. 1998) (internal quotations and citations omitted). A plaintiff seeking relief under §1983 may bring a claim against a public official in the official's individual or official capacity. Individual-capacity claims "seek to impose individual liability upon a government officer for actions taken under color of state law." Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). In contrast, an official-capacity claim is "another way of pleading an action against an entity of which an officer is an agent." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

The Eleventh Amendment to the United States Constitution "bars suits brought in federal court against a state and its agencies unless the state has waived its sovereign immunity or consented to be sued in federal court." Grinter v. Knight, 532 F.3d 567, 572 (6th Cir. 2008), citing Will v. Michigan Dept. of State Police, 491 U.S. 58, 66 (1989); additional citations omitted). This immunity extends to claims against individuals sued in their official capacity to the extent that those claims seek monetary damages. Barker v. Goodrich, 649 F.3d 428, 433 (6th Cir. 2011), reh'g denied (Sept. 12, 2011); see also McCormick v. Miami Univ., 693 F.3d 654, 662 (6th Cir. 2012).

Ohio has not waived its sovereign immunity or consented to being sued in federal court. See Mixon v. State of Ohio, 193 F.3d 389, 397 (6th Cir. 1999); see also Barker, 649 F.3d at 432 ("The burden of establishing Eleventh Amendment immunity lies with the state, and the defense is waived if it is not raised.") (citations omitted). Furthermore, section 1983 has not abrogated that immunity. See Campbell v. Hamilton Cnty., 23 F. App'x 318, 327 (6th Cir. 2001), quoting Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Accordingly, because the claims at issue here are claims for monetary damages, claims against defendants in their official capacities are barred by the Eleventh Amendment.

D. Remaining Claims as Identified by Defendants

As explained above, taking into account all of Mr. Brown's allegations, Defendants have moved for judgment on the pleadings on the basis of qualified immunity as to nine claims they have identified by specific paragraph as set forth in the third amended complaint. They note in their motion that these claims are very similar to claims raised by Mr. Brown in Brown v. Voorhies, Case No. 2:07-cv-13 (Frost, J.), a case involving alleged unconstitutional actions Mr. Brown suffered while housed in the Franklin County Jail.

Defendants contend that in the remaining paragraphs of his pleadigns, Mr. Brown has not identified any specific Defendant responsible for any alleged constitutional violation. They also contend that liability cannot be based on the doctrine of respondeat superior. Consequently, in addition to the nine claims they have identified by specific paragraph, they argue that any other claims contained in the remaining paragraphs must also be dismissed for these reasons.

As noted above, in his response, Mr. Brown recognizes the claims as characterized by Defendants and sets forth the

-20-

paragraphs he contends support such claims.  To the extent that Mr. Brown's response can be read as going beyond this and attempting to incorporate new claims, the Court will not consider them.

For ease of discussion, the Court will address the specific claims as raised by the Defendants' motion and explained by Mr. Brown.  Because the Defendants primarily rely on the affirmative defense of qualified immunity, the Court will address this legal standard before considering the individual claims.

Before doing so, however, the Court notes that Defendants' motion raises another issue, the issue of service.  As a starting point, the current defendants in this case are these thirteen individuals:  Dr. Krisher, Robert Whitten, Nurse Smith, Charlie Heiss, D.W. Upchurch, Mr. Seacrest, Warden Jeffries, Director Mohr, Trevor Clark, Austin Stout, Greg Trout, Ryan Dolan and Mr. Voorhies.  According to the motion for judgment on the pleadings, at the time of its filing, only the seven moving defendants had been served.  Director Mohr has now been served and has filed a motion to dismiss.  Additionally, as explained below, Defendants Trout, Stout, and Nurse Smith have not been served.  According to the Court's review of the docket, summonses were returned executed as to the remaining two defendants, Mr. Voorhies and Trevor Clark, on January 12, 2016, indicating a service date of January 6, 2016. (Doc. 149).  These Defendants did not join in any of the pending dispositive motions.

Also before addressing the issue of qualified immunity, the Court will set forth the organizational structure it will apply in considering Mr. Brown's numerous allegations.  First, as noted, the Court views the operative complaint as encompassing two time periods - January 18 to April 6, 2011, and March 15 to August 26, 2013.  Further, the Court construes the allegations of Paragraphs 1 through 33 of the third amended complaint as

relating to the first time period and Paragraphs 37 through 45 and Paragraphs 32 through 41 as relating to the second time period.  The allegations of the original complaint which were incorporated by reference relate to the time period between January 18 and April 6, 2011, with the exception of Paragraphs 33 and 83.

### 1.  <u>Qualified Immunity</u>

Public officials sued under 42 U.S.C. §1983 in their individual capacities may raise "qualified immunity" as a defense to the suit.  That defense has been explained as follows:

> "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known."

<u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  Conversely, "if the law was clearly established, the immunity defense should fail, since a reasonably competent public official should know the law governing his conduct."  <u>Id</u>. at 818-19.

As explained in <u>Dominique v. Telb</u>, 831 F.2d 673 (6th Cir. 1987), when the defense of qualified immunity is raised, a plaintiff must include in the pleadings factual allegations necessary to support the conclusion that the defendants violated clearly established law.  When the defense is raised by motion, "the District Court must decide the purely legal question of whether the law at the time of the alleged action was clearly established in favor of the plaintiff."  <u>Id</u>.  The Court's decision on this issue should indicate the law as the Court perceives it and the basis for its conclusion that the constitutional rights at issue were clearly established.

In order for a constitutional right to be clearly established, it is necessary that a decision of the Supreme Court, the highest Court of the state, or a Court of Appeals

announce the constitutional principle.  See Robinson v. Bibb, 840
F.2d 349 (6th Cir. 1988).  A single, idiosyncratic decision from
one Court of Appeals is not sufficient to establish clearly a
constitutional right.  Davis v. Holly, 835 F.2d 1175 (6th Cir.
1987).

Generally, dismissals on the basis of qualified immunity are
"made pursuant to summary judgment motions, not 12(b)(6)
sufficiency of the pleadings motions."  Grose v. Caruso, 284
Fed.Appx. 279, 283 (6th Cir. 2008).  However, "this circuit
permits a reviewing court to dismiss under Fed.R.Civ.P. 12(b)(6)
based on qualified immunity."  Jackson v. Schultz, 429 F.3d 586,
589 (6th Cir. 2005)(citation omitted).  As the Court recognized
in Shoup v. Doyle, 974 F.Supp.2d 1058, 1071-1072 (S.D. Ohio
2013)(Rice, J.), this presents two issues.  The first issue is
whether a plaintiff has stated a viable claim which the Court may
consider under the 12(b)(6) standard.  Id.  However,
"'[q]ualified immunity is an affirmative defense and a plaintiff
does not need to anticipate it to state a claim.'"  Id., quoting
Jackson, 429 F.3d at 589.  That is, "there is no heightened
pleading standard for claims brought under Section 1983."  Id.
(citation omitted).  The Rule 12(b)(6) analysis is basically
collapsed into the first part of the qualified immunity inquiry."
Id. at 1073, citing Pearson v. Callahan, 555 U.S. 223 (2009).  A
qualified immunity defense raises a second issue, however,
because it imposes a burden on a plaintiff "beyond simply stating
a viable claim under Section 1983."  Id. at 1072.  Rather, in
addition, a plaintiff must "demonstrate that the constitutional
rights were 'clearly established' at the time of the alleged
violation to survive Defendants' qualified immunity challenge."
Id., quoting Jackson, at 589.  Consequently, for each claim
identified by the Defendants, the Court must first consider
whether the allegations, construed in Mr. Brown's favor, are

sufficient to state a claim under §1983. If he has sufficiently alleged such a violation, only then will the Court need to address whether the right was clearly established at the time of the alleged violation such that a reasonable prison official would have known of the violation.

   2. <u>Allegation One: Warden Jeffries violated Brown's 1st and 8th Amendment and RLUIPA rights by putting him in a cell with a Neo-Nazi inmate (¶5)</u>

      Defendants assert that Warden Jeffries did not violate Mr. Brown's rights by placing him in a cell with a Neo-Nazi inmate. They construe this claim as a failure to protect claim and contend that Mr. Brown has not demonstrated that Warden Jeffries was deliberately indifferent to a substantial risk of serious harm to Mr. Brown. In response, Mr. Brown asserts that "[i]t would be obvious to anyone that putting a Jew in a cell with a Nazi is asking for trouble and could cause the Jew to be killed...." He explains that he had been attacked, robbed, and extorted by Nazi inmates prior to his incarceration at RCI and that, upon his arrival there, he requested not to be housed with a Nazi. He asserts that "[h]e was told he had no say where he celled by policy and per Warden Jeffries who refused to separate prisoners by race, religion, or for any other reason." While he states that his cellmate stole his medication, he does not state that he was in any physical danger or suffered any physical harm. Further, he does not specifically identify this inmate, does not indicate how long he was housed with this particular inmate, does not discuss this inmate's behavioral history, and does not state that this inmate specifically threatened him in any way. A fair reading of both the operative complaint and Mr. Brown's response, however, suggests that he was housed with this inmate for a short period of time and, after the inmate stole his medication, Mr. Brown was removed from the cell.

-24-

Here, Defendants correctly point out that the key constitutional issue raised by Mr. Brown is whether, by housing him with a Neo-Nazi cellmate, they demonstrated deliberate indifference to a serious risk of physical harm.  See generally Farmer v. Brennan, 511 U.S. 825 (1994).  In the specific context of threats of harm posed by other inmates, the Court of Appeals has recognized the duty of prison officials to protect inmates against assault at the hands of other inmates.  See Wilson v. Yaklich, 148 F.3d 596, 600 (6th Cir. 1998) ("Without question, prison officials have an affirmative duty to protect inmates from violence perpetrated by other prisoners").

A failure to protect claim is governed by standards substantially similar to those applied to the claim for deliberate indifference to serious medical needs.  Amick v. Ohio Dep't of Rehabilitation & Correction, 521 Fed.Appx. 354, 361 (6th Cir. Nov. 27, 2013).  To make out a prima facie case, a plaintiff's "allegations must satisfy an objective component and a subjective component."  Id., citing Farmer, 511 U.S. at 835-38.  A plaintiff satisfies the objective component by alleging "that absent reasonable precautions, an inmate is exposed to a substantial risk of serious harm."  Id.  "To satisfy the subjective component, a plaintiff must allege that the defendant was aware of facts from which the inference could be drawn that a substantial risk of harm would exist if reasonable measures were not taken, that the defendant actually drew the inference, and that the defendant acted in disregard of that risk."  Id., citing Farmer, 511 U.S. at 837.

Mr. Brown has not alleged facts indicating deliberate indifference to serious physical harm.  The facts he alleges about the theft of his medication do not show that he was subjected to a substantial risk of serious physical harm.  See Tillman v. Huss, 2013 WL 4499228, *13 (W.D. Mich. Aug. 19,

-25-

2013)(verbal harassment, false misconduct charges, and theft of property are incidents not involving a substantial risk of serious physical harm). Consequently, the Court will recommend that the motion for judgment on the pleadings be granted with respect to this claim against Warden Jeffries.

   3. <u>Allegation Two: Dr. Krisner violated Brown's 8th Amendment and ADA rights with medical indifference (¶¶8,12,13,37,38)</u>

   Defendants argue that they are entitled to judgment on the pleadings on this claim because, in response to Mr. Brown's motion seeking a preliminary injunction, they provided his medical records demonstrating that he has received treatment for all of his actual ailments. Because this evidence, along with a declaration from Nurse Kelli Cardaras, are already part of the record in this case, Defendants assert that it is proper for the Court to consider them in ruling on the current motion.

   In response, Mr. Brown argues that his claim against Dr. Krisher is set forth in paragraphs 4,7-8, 11-19, 24-25, 31, 37-41, 46, 53, and 56-60. He claims Ms. Cardaras' declaration is perjured and relates only to his second incarceration at RCI. He specifically objects to its use in connection with Defendants' current motion, stating that "he objects to the use of this affidavit in this motion or consider that motion one of summary judgment and allow a full briefing after discovery is done."

   While Defendants are correct that the Court may take items in the record into account when considering a motion for judgment on the pleadings, there is no requirement that the Court do so. In this case, the item in the record the Defendants urge the Court to consider is an affidavit they submitted in response to Mr. Brown's earlier motion for preliminary injunctive relief. Had Defendants filed this affidavit in response to the current motion, the Court would be unable to consider it without converting the motion to one for summary judgment. <u>Northville</u>

-26-

Downs v. Granholm, 622 F.3d 579, 585 (6th Cir. 2010). This would have required notice and an opportunity to present all material relevant to a motion for summary judgment. Id. In light of this, and Mr. Brown's specific objection, the Court declines to consider this affidavit in connection with the current motion for judgment on the pleadings. To hold otherwise may allow Defendants to benefit solely from Mr. Brown's filing of a preliminary injunction motion while simultaneously disadvantaging him simply for having done so.

Looking at Mr. Brown's operative complaint, he is correct that the allegations of deliberate indifference to his serious medical needs encompass both periods of his incarceration at RCI. Allegations arising during his incarceration at RCI between January 18, 2011 and his transfer out on April 6, 2011, appear to be set forth prior to Paragraph 34. Allegations arising during the time period from his return to RCI on March 15, 2013, and the date his motion for leave to amend was filed - August 26, 2013 - appear to be set forth beginning with Paragraph 37.

To establish an Eighth Amendment violation premised on inadequate medical care, Mr. Brown must demonstrate that the defendants acted with "deliberate indifference to serious medical needs." Farmer v. Brennan, 511 U.S. 825, 835 (1994), quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976). To rise to the level of an Eighth Amendment violation, a prison official must "know of and disregard an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harms exists, and he must also draw the inference. Farmer, 511 U.S. at 837-38. Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments. Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

-27-

Turning to the allegations of the complaint as they relate to Mr. Brown's medical care during his first period of incarceration at RCI, these allegations indicate the following. Mr. Brown saw Dr. Krisher after his arrival at RCI. Dr. Krisher discontinued Mr. Brown's medication based on Mr. Brown's misuse. While he was "[i]n the hole," he had a seizure and fell from his top bunk injuring his neck, head, shoulder and back. He asserts that Dr. Krisher had refused to renew his bottom range restriction. In Paragraph 14, he contends that Dr. Krisher refused to treat him for these injuries but in Paragraph 15, he states that he was placed in the medical unit. While he states that he was placed in an unheated cell in that unit, got sick, and was denied medication, he also states in Paragraph 17 that on "[t]he next shift" he was moved into a heated cell and given his medication. The Court does not construe Paragraphs 19, 24-25, and 31 as relating to an Eighth Amendment claim against Dr. Krisher.

With respect to Mr. Brown's first period of incarceration at RCI, none of these allegations, even liberally construed in Mr. Brown's favor, suggest a denial of medical care sufficient to support an Eighth Amendment claim. At most, they suggest disagreement with a recommended course of action. Even to the extent that Mr. Brown contends that he was forced to endure difficult conditions upon his initial placement in the medical unit, he also explains that his exposure to these conditions did not last for more than one shift. Disagreement over the correctness of a medical judgment is not sufficient to establish deliberate indifference. Estelle v. Gamble, 429 U.S. 97, 106 (1976). Consequently, the Court will recommend that the motion for judgment on the pleadings be granted as to Mr. Brown's Eighth Amendment claim directed to Dr. Krisher as it relates to Mr. Brown's first period of incarceration at RCI.

-28-

Turning to the allegations of the complaint relating to Mr. Brown's second period of incarceration at RCI, the Court notes that, to the extent Mr. Brown cites to Paragraphs 46, 53, and 56-60 as setting forth his claim, these paragraphs have been stricken.  A review of the remaining paragraphs identified by Mr. Brown, Paragraphs 37-41, indicates that the allegations directed to Dr. Krisher are primarily contained in Paragraph 37.  This paragraph alleges Dr. Krisher's denial of Mr. Brown's medication, his cancellation of numerous previously ordered medical tests, and his failure to treat Mr. Brown's numerous medical conditions including high blood pressure, diabetes, and sleep apnea.  Mr. Brown alleges that Dr. Krisher's failure to provide medical care left him sick and in pain.

These allegations, liberally construed in Mr. Brown's favor are sufficient to state an Eighth Amendment claim.  Because the Defendants assert only that, based on Ms. Cardaras' affidavit, they have established that Mr. Brown was not denied medical care in violation of his Eighth Amendment rights, they have not addressed the second prong of their qualified immunity argument.  Moreover, that the deliberate indifference to an inmate's serious medical need violates the Eighth Amendment was well-established by the relevant time period.  See Estelle v. Gamble, supra.  Consequently, the Court will recommend that the motion for judgment on the pleadings be denied as to Mr. Brown's Eighth Amendment claim directed to Dr. Krisher as it relates to Mr Brown's second period of incarceration at RCI.

4.  Allegation Three: Defendant Jeffries retaliated against Brown (¶¶11, 18, 31)

Defendants contend that Mr. Brown cannot satisfy the second prong of a retaliation claim because he both preferred being placed in isolation, the alleged adverse action he suffered, and admits that he will not stop making complaints.  At one point in

his response, Mr. Brown contends that his claim for retaliation against Warden Jeffries is clearly spelled out in Paragraphs 11, 12, 18, 19, 20, 21, 23, 24, 25, 31, 32, 33, and 34.  See Response (Doc. 172) pp. 15-16.  Later in his response, he states that his claim of retaliation against Warden Jeffries is stated in paragraphs 5, 11, 18, 20, 21, 23, 25, 31, 35, 32, and 34.  Id. at p. 18.

A review of all of these paragraphs reveals very broad and non-specific claims of retaliation for various verbal complaints Mr. Brown made about his medical care and conditions of confinement which resulted in either his security level being raised or his placement in segregation.  In Paragraph 20 he states that "[h]e also completed the grievance process and was denied relief by L.C. Covel."  There are no factual allegations suggesting that Warden Jeffries was aware of the grievance process.

To state a retaliation claim, a plaintiff must allege three elements: (1) that he or she was engaged in protected conduct; (2) an adverse action was taken against him or her that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.  Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999).  Retaliation claims must include a "chronology of events from which retaliation may plausibly be inferred."  Ishaaq v. Compton, 900 F.Supp. 935 (W.D. Tenn. 1995) (quoting Cain v. Lane, 857 F.2d 1139, 1143 n. 6 (7th Cir. 1988)).

As noted, the focus of Defendants' argument on this claim is that Mr. Brown's preference for isolation and his admission that he will not stop making complaints prevents him from establishing the second prong of a retaliation claim.  Because Defendants have limited their argument to this issue, the Court will limit its

-30-

consideration of Mr. Brown's allegations of retaliation to this issue as well.  Defendants' argument is not compelling.  As the Court of Appeals has explained, "[t]he relevant question regarding the second prong of the Thaddeus-X test is whether the defendant's adverse conduct was 'capable of deterring a person of ordinary firmness.'"  Harbin-Bey v. Rutter, 420 F.3d 571, 579 (6th Cir. 2005), quoting Bell v. Johnson, 308 F.3d 594, 606 (6th Cir. 2002).  "Actual deterrence need not be shown."  Id.  That is, "the adverseness inquiry is an objective one, and does not depend upon how the particular plaintiff reacted."  Bell, 308 F.3d at 606.

The Court of Appeals has held that both the placement in administrative segregation and an increase in security-level classification constitute an adverse action.  See Hill v. Lappin, 630 F.3d 468, 474 (6th Cir. 2010)(recognizing that the placement in administrative segregation or something comparable constitutes an adverse action); King v. Zamiara, 150 Fed.Appx. 485, 494 (6th Cir. 2005)(recognizing that increase in security-level classification was an adverse action because it resulted in more restrictions).  Because the Defendants assert only that Mr. Brown did not state a claim for retaliation as a result of his failure to satisfy the second element, they do not go further and address the second prong of their qualified immunity argument.  That is, assuming Mr. Brown has stated a claim, Defendants do not address whether, prior to the relevant time period, the law was not clear that prison officials could not retaliate against prisoners for engaging in protected conduct.  Further, they do not suggest that it was not well-established that these specific forms of conduct constituted adverse action for purposes of a retaliation claim prior to the relevant time periods in the complaint.

The Court is not inclined to make the Defendants' argument for them.  Moreover, it seems likely that the Court of Appeals

-31-

would agree that these specific contours of a retaliation claim were well-established by the relevant time period.  See, e.g., Herron v. Harrison, 203 F.3d 410, 416 (6th Cir. 2000) ("Under the proper standard expressed in Thaddeus-X, however, this court has found that placing an inmate in administrative segregation 'could deter a person of ordinary firmness from exercising his First Amendment rights'"); King v. Zamiara, supra.  Consequently, the Court will not recommend that Mr. Brown's retaliation claim against Warden Jeffries be dismissed on grounds of qualified immunity.

   5.  Allegation Four: Conditions of Confinement in the Supermax
       Cell against Jeffries, Whitten, Heiss, Upchurch and Seacrest
                  violated the Eighth Amendment (¶¶19-20)

   Defendants construe Mr. Brown's complaint as setting forth a conditions of confinement claim in Paragraphs 19-20.  To the extent that Mr. Brown is contending that he was forced to endure unconstitutional conditions of confinement in a supermax cell at RCI, they contend that RCI is not a supermax prison.  Further, they contend that he has failed to meet the pleading standard because he has not identified which Defendant was responsible. Additionally, they contend that the conditions he complains of arose at the Southern Ohio Correctional Facility and on a date that falls outside the confines of this case.  Finally, they argue that Mr. Brown does not allege all of the elements of an Eighth Amendment claim because he does not allege that any defendant was aware that a substantial risk of harm existed. Rather, they assert he has only alleged that they did not respond to his complaints.  They note that Section 1983 liability cannot be based on the mere failure to act.

   In response, Mr. Brown states that his Eighth Amendment conditions of confinement claim is set forth in Paragraphs 4-5, 11, 15, 19-21, 23-26, 40, 43-45, and 52-54.  The Court's review

of these paragraphs, with respect to a conditions of confinement claim, indicates the following.  Upon his arrival at RCI, he was placed in a cell with a Neo-Nazi inmate who stole his medication.  Warden Jeffries ordered Mr. Brown be taken "to the hole" after Mr. Brown voiced complaints.  Mr. Brown was placed in an unheated cell in the medical unit.  Because of these complaints, Warden Jeffries raised Mr. Brown's security level.  He spent four months in a "supermax type cell" in cruel and unusual conditions.  He complained of these conditions to various officials to no avail.  Paragraph 21 appears to relate to his access to the courts claim and does not appear to relate to conditions of confinement.  Paragraphs 23 and 24 do not appear to relate to a conditions of confinement claim.  Paragraph 26 has been stricken.  In Paragraph 40, as it relates to conditions of confinement, Mr. Brown alleges that he was denied commissary privileges and exercise.  Paragraph 43 has been stricken.  In Paragraph 44, Mr. Brown alleges that he was housed with Nazis, skinheads, and Christian separatists.  Paragraph 45 relates primarily to individuals who are not defendants in this action.  The allegations of Paragraph 45 with respect to Mr. Heiss are that he ignored Mr. Brown's complaints about his safety and conditions.  Paragraphs 52-54 have been stricken.  Mr. Brown concludes his explanation of this claim by stating that " [t]he complaint alleges defendants Jeffries, Whitten, Heiss, Upchurch and Seacrest were made aware of the unconstitutional conditions and were deliberately indifferent to the plaintiff's rights to be housed in adequate conditions."  See Response (Doc. 172), p. 26.

To sufficiently allege a conditions of confinement claim under the Eighth Amendment, a plaintiff must plead facts that establish that a sufficiently serious deprivation has occurred.  Melendez v. Houghlen, 2016 WL 375083, *2 (N.D. Ohio Feb. 1, 2016), citing Wilson v Seiter, 501 U.S. 294, 298 (1991).

-33-

"Seriousness is measured in response to 'contemporary standards' of decency.'" Id., quoting Hudson v. McMillian, 503 U.S. 1,8 (1992). "Routine discomforts of prison life do not suffice." Id. Only deliberate indifference to extreme deprivations regarding the conditions of confinement will implicate the protections of the Eight Amendment. Further, a plaintiff must allege that prison officials acted with a sufficiently culpable state of mind. Id. A prison official violates the Eighth Amendment only when both the objective and subjective components are met. Farmer v. Brennan, 511 U.S. 825, 833 (1994).

Here, Mr. Brown's allegations relate to nothing more than the routine discomforts of prison life. The closest he comes to stating such a claim is his description of the conditions of his isolation cell. However, he does not associate this allegation with any particular defendant. Moreover, he explains in his response that he seeks to hold certain Defendants liable based solely on their failure to respond to his complaints. He does not, however, provide any specific detail of his alleged complaints to these Defendants such as how he made the complaints, the information he provided in his complaints, or whether they received any of his complaints. At most he suggests that he undertook the grievance process and was denied relief by an individual who is not named as a defendant in this case.

Generally, supervisory liability under §1983 does not attach when it is premised on a mere failure to act; it must be based on active unconstitutional behavior. Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999). Absent any more specific detail from Mr. Brown suggesting that Defendants had some personal knowledge of these conditions but allowed them to persist, Mr. Brown has not set forth a conditions of confinement claim sufficient to survive a motion for judgment on the pleadings. For these reasons, the Court will recommend that the motion for judgment on

-34-

the pleadings be granted as to Mr. Brown's conditions of confinement claim against Defendants Jeffries, Whitten, Heiss, Upchurch, and Seacrest.

The Court notes that, included within this claim as Mr. Brown explains it, are allegations that he was denied the right to call his dying mother.  Defendants have construed these particular allegations as attempting to state a claim against Warden Jeffries for an Eighth Amendment violation.  As such, they have treated it as an independent claim and have addressed it separately.  The Court will address Defendants' argument as to these allegations below.

6.  <u>Allegation Five: Denial of access to the courts by withholding legal documents and mail, denying access to court-appointed lawyer, denying access to the phone, denying access to a law library, denying stamps and legal supplies, denying a pen and paper, denying law books by Jeffries, Heiss, Upchurch, Dolan, Whitten (¶¶21, 33)</u>

According to Mr. Brown's operative complaint, he is asserting a claim for the denial of his right of access to the courts against Director Mohr, Mr. Stout, Mr. Trout, Mr. Clark, Mr. Dolan, Warden Jeffries, Mr. Heiss and Insp. Whitten.  The Defendants do not challenge the various allegations that Mr. Brown contends form the basis of many facets of an access to the courts claim.  Rather, the focus of Defendants'  motion is that, even assuming Mr. Brown suffered all of the deprivations he contends, including lack of access to a law library, denial of legal supplies, interference with legal mail, limitations on the amount of legal material he may store in his cell and the many other allegations he makes that arguably could fall under the umbrella of an access to the courts claim, Mr. Brown has not demonstrated actual injury and, as a result, has not set forth such a claim.

As the Court of Appeals has explained:

-35-

"[T]he right [of access to the courts] is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." Christopher v. Harbury, 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002). To bring a §1983 claim for violation of a prisoner's right of access to the courts, the prisoner must "plead and prove prejudice stemming from the asserted violation." Pilgrim v. Littlefield, 92 F.3d 413, 416 (6th Cir. 1996). In order words, he must demonstrate "actual injury," Lewis v. Casey, 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), by showing that his underlying claim was non-frivolous. See id. at 353, 116 S.Ct. 2174 (reasoning that the "actual injury" requirement means that inmates must "demonstrate that a nonfrivolous legal claim ha[s] been frustrated or was being impeded."). "It follows that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint...." Harbury, 536 U.S. at 415, 122 S.Ct. 2179.

A plaintiff need not demonstrate that the underlying claim would have been successful; instead, deprivation of an "arguable (though not yet established) claim" is sufficient. Lewis, 518 U.S. at 353 n. 3, 116 S.Ct. 2174. However, though a complaint must be construed in the light most favorable to the plaintiff when the defendant files a motion to dismiss, the complaint must still contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S.Ct. 1955. In a denial-of-access case, "the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant," just "[l]ike any other element of an access claim." Harbury, 536 U.S. at 416, 122 S.Ct. 2179 (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513-15, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

The Supreme Court has already addressed the specificity with which these underlying claims must be pleaded:

Although we have no reason here to try to describe pleading standards for the entire spectrum of access claims, this is the place to address a particular risk inherent in backward-looking claims. Characteristically, the action underlying this sort of access claim will not be tried

-36-

independently, a fact that enhances the natural
temptation on the part of plaintiffs to claim too
much, by alleging more than might be shown in a
full trial focused solely on the details of the
predicate action.

Hence the need for care in requiring that the
predicate claim be described well enough to apply
the "nonfrivolous" test and to show that the
"arguable" nature of the underlying claim is more
than hope. And because these backward-looking
cases are brought to get relief unobtainable in
other suits, the remedy sought must itself be
identified to hedge against the risk that an
access claim be tried all the way through, only to
find that the court can award no remedy that the
plaintiff could not have been awarded on a
presently existing claim.

Id. (footnotes omitted).  Ultimately, the Court
concluded that "the complaint should state the
underlying claim in accordance with Federal Rule of
Civil Procedure 8(a), just as if it were being
independently pursued." Id. at 417, 122 S.Ct. 2179.
Essentially, a claim for denial of access to the courts
has unique pleading requirements: a plaintiff must
plead a case within a case, alleging the law and facts
sufficient to establish both the interference with his
access to the courts, and the non-frivolous nature of
the claim that was lost.

Brown v. Matauszak, 415 Fed.Appx. 608, 612 (6th Cir. 2011).

Mr. Brown recognizes his obligation to allege actual

injury.  In his response, he describes the harm he suffered in

this way:

### Access to the court and stated harm.

This harm was claimed throughout the complaint.
See paragraph 21).  This denial of his right to access
the courts and O.D.R.C. administrators harmed his
ability to persue his two lawsuits in federal court,
his ability to seek help with his mistreatment at
R.C.I. from his lawyer or the Ross County Courts, to
provide documents in support of his habeas corpus, that
proved actual innocence of his crime, to persue post
conviction remedies, to meet court deadlines in his

-37-

civil rights cases and due to the total denial of his right to access the court [he ]finally signed, under duress a settlement in Brown v. Voorhies - (Cincinnati) "THIS RETALIATION for seeking redress of the violation of constitutional rights was done by ... Warden Jeffries.

This is clear enough. The plaintiff clearly stated a claim for the denial of his right to access the courts and the harm caused by the defendants including Jeffries. Therefore this issue cannot be dismissed for failure to state a claim and a judgment on the pleadings.

<u>Access to the Court</u>

Additionally, it is properly claimed that Jeffries, Heiss, Upchurch, Dolan and Whitten denied access to the courts as alleged in paragraphs (21 & 33). This claim does claim harm by this denial and makes specific charges of how, what, where when and why.

A conspiracy was also claimed by these defendants to deny court access to force a settlement in <u>Brown v. Voorhies</u>, where the Cincinnatti Court had awarded, and upheld by the Chief Judge, a $675,000.00 default judgment. And as claimed as harm, for this denial of access to the court, retaliation, denial of medical care and literal torture by the refusal to allow me to call my dying mom, that the plaintiff signed a settlement for $5000.00 so he could call his mom who was calling out from her death bed to say goodbye before she died.

It is alleged that this harm and more occurred from 4 1/2 months at RCI and more months at SOCF in isolation conditions.

A prisoner has a right to <u>adequate</u>, <u>effective</u>, and <u>meaningful</u> access to the courts under the First Amendment. <u>Lewis v. Casey</u>, 518 U.S. 343 346 (1986). This denial was properly claimed as this court found on review of the complaint already.

Clearly, Mr. Brown has not met the pleading standard for an access to the courts claim. His allegations, while numerous and repetitive, are completely devoid of any detail. The only case he mentions by name is <u>Brown v. Voorhies</u>, a case in which he

-38-

readily admits he received a settlement.  He cites generally to various forms of litigation he was unable to pursue but he does not cite to any deadlines he missed or the non-frivolous nature of any claims he wished to present.  Consequently, the Court will recommend that the motion for judgment on the pleadings be granted as to Mr. Brown's claim for a denial of access to the courts against Defendants Mr. Heiss, Warden Jeffries, and Insp. Whitten.

7.  <u>Allegation Six: Defendant Upchurch violated Plaintiff's First Amendment right to the free exercise of his religion by denying him kosher meals (¶22)</u>

Defendants contend that, although Mr. Brown asserts in his operative complaint at Paragraph 22 that Defendant Upchurch violated his right to the free exercise of his religion by denying him kosher meals, he admits in Paragraph 41 that he received kosher meals.  The Defendants interpret paragraph 41 as raising a complaint over the quality of food served by Aramark, an entity that is not a defendant here.  They then contend that complaints about the quality of food do not rise to the level of a constitutional violation.  Mr. Brown responds that he has stated a claim for the denial of kosher food in paragraphs 22 and 41 of his operative complaint.

Under the First Amendment, prisoners have the right to the free exercise of their religion.  <u>Cruz v. Beto</u>, 405 U.S. 319, 322 (1972).  Within this right, prisoners "have a constitutional right to be served meals that do not violate their sincerely-held religious beliefs."  <u>Robinson v. Jackson</u>, 615 Fed.Appx. 310 (6th Cir. 2015), citing <u>Colvin v. Caruso</u>, 605 F.3d 282, 290 (6th Cir. 2010).

A fair reading of Mr. Brown's allegations relating to the denial of kosher food indicates the following.  According to Paragraph 22, during his first incarceration at RCI, Defendant

-39-

Upchurch refused to approve his kosher diet.  She then punished him for "writing a grievance over the issue."  According to Paragraph 41, during his second incarceration at RCI, the kitchen manager, Mr. Ford, refused to provide a kosher diet.  This denial of kosher food during Mr. Brown's second incarceration at RCI lasted for approximately four months until he was placed back on a kosher diet.  Mr. Brown challenges the quality of the food he received after Aramark took over the food service during his second incarceration.

The Court does not believe that the allegations of Paragraph 41 undermine the allegations of Paragraph 22.  However, the allegations of Paragraph 41 do not relate to Mr. Brown's claim against Ms. Upchurch and will not be considered here.  Under this construction of the complaint, Mr. Brown's claim against Ms. Upchurch is that she denied his request for kosher food during his first incarceration at RCI for some period of time between January 18, 2011 and April 6, 2011.  He also indicates that, to the extent he pursued a grievance over it, she punished him for it.

Granted, Mr. Brown's allegations can easily be characterized as light on specifics.  He does not explain the length of time he was denied a kosher diet during his first incarceration or any other details relating to this alleged denial.  Further, he does not explain what type of punishment he was subjected to or the nature of his pursuit of the grievance process.  As opposed to the majority of his other claims, however, he specifically identifies Ms. Upchurch as the responsible party and states her conduct clearly.  At the same time, Defendants' motion for judgment on the pleadings on grounds of qualified immunity does not address the issue as Mr. Brown has framed it.  They have neither argued that Mr. Brown did not have a constitutional right to a kosher diet, nor that any right to a kosher diet was not

-40-

clearly established at the time of his incarceration at RCI.
Consequently, the Court will not recommend that the motion
for judgment on the pleadings be granted as to this claim.

   8.  Allegation Seven: Defendant Jeffries refused to allow
Plaintiff to speak to his dying mother in violation of the Eighth
Amendment (¶23)

     Defendants construe this Paragraph as alleging an Eighth
Amendment violation against Defendant Jeffries based on his
alleged refusal to allow Mr. Brown to speak to his dying mother.
Although they have included this claim with claims that they
contend must be dismissed on grounds of qualified immunity, they
contend that this particular claim must be dismissed under the
doctrine of res judicata.  According to Defendants, this claim
was fully litigated in Brown v. Voorhies, Case No. 2:07-cv-13.

     In response, Mr. Brown explains that Brown v. Voorhies was
filed in 2007 and that it was still pending in 2011 while he was
incarcerated at RCI.  He states that there are no claims from any
incident at Ross in the 2007 action.  According to Mr. Brown,
that case involved events which occurred at the Franklin County
Jail in 2005 and SOCF in 2007.  He contends that this particular
claim was raised for the first time in this action and "has never
been litigated in any court."

      A review of Brown v. Voorhies, indicates that Mr. Brown's
explanation is correct.  That action, filed in 2007 and relating
to events at the Franklin County Jail, does not address the
events of February 4, 2011, at RCI.  Further, Warden Jeffries was
not a named defendant in that case.  The Court of Appeals has
explained that res judicata bars the same parties from
relitigating issues that were either actually litigated or could
have been raised in an earlier action.  J.Z.G. Res., Inc. v.
Shelby Ins. Co., 84 F.3d 211, 214 (6th Cir. 1996).  As noted,
that is not the situation presented here.  Consequently, the

Court will recommend that the motion for judgment on the pleadings be denied with respect to this claim directed to Warden Jeffries to the extent it relies on the doctrine of res judicata.

    9. <u>Allegation Eight: Defendants Jeffries, Upchurch, Heiss, Seacrest, and Dolan violated Plaintiff's right to be free from torture (¶25)</u>

Defendants construe the allegations of Paragraph 25 as asserting a claim of torture.  In response, Mr. Brown explains that this claim is fully encompassed by Paragraphs 19, 20, 21, 24, 25, 28, 31, 35, 54, 53, 52.  Paragraphs 28, 35, and 52-54 have been stricken.  The allegations of the remaining paragraphs have been addressed in connection with Mr. Brown's other claims, with the exceptions of Paragraph 25, as construed by Defendants here, and Paragraph 31.

The allegations of Paragraph 25 are that, after being denied his request to call his mother, Mr. Brown "went completely crazy" and his request for mental health treatment was denied.  He contends that he was harassed, his legal papers were torn up, his food was spilled on the floor, he was denied his medication, and his legal mail was destroyed.

The allegations of Paragraph 31 are that Warden Jeffries had Mr. Brown placed in a suicide cell naked, not because Mr. Brown had threatened to kill himself, but for the purpose of making Mr. Brown more miserable.  Mr. Brown contends that Warden Jeffries and others taunted him for two days and that he was not visited by mental health personnel.  Defendants construe the allegations of Paragraph 31 as relating to the claim of retaliation against Warden Jeffries and have addressed them in this way.  As indicated above, based on the argument Defendants presented relating to that claim, the Court will not recommend that the motion for judgment on the pleadings be granted as to this retaliation claim.

Focusing on the allegations of Paragraph 25, Defendants

-42-

contend that Mr. Brown has not met the pleading requirements to state a claim under §1983 because he has failed to connect the individuals responsible to his various allegations.  Further, they assert that certain allegations such as spilling his food or making fun of his mother's death do not rise to the level of an Eighth Amendment violation.  Further, they maintain that they have already established that Mr. Brown has not stated a claim of deliberate indifference to his medical needs.  Further, they explain that, again, Mr Brown has not demonstrated any prejudice to his ability to pursue his legal claims.

The Court agrees that many of the allegations of Paragraph 25 are addressed in the context of other claims.  Additionally, to the extent that Mr. Brown contends he suffered taunting and verbal harassment, he has not stated an Eighth Amendment violation.  <u>Ivey v. Wilson</u>, 832 F.2d 950, 955 (6th Cir. 1987). This leaves Mr. Brown's allegation that he requested and was denied mental health treatment in connection with the events surrounding his mother's death.  The Court agrees with Defendants that Mr. Brown has not stated these allegations in such a way as to identify any of the moving Defendant's role in this denial. That is, Mr. Brown has not met the plausibility standard to allow the Court to draw the reasonable inference that any of the moving Defendants were responsible for the alleged denial of mental health treatment.  <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Consequently, the Court will recommend that the motion for judgment on the pleadings be granted as to this claim as it relates to Warden Jeffries, DW Upchurch, Mr. Heiss, Mr. Seacrest, and Mr. Dolan.

10. <u>Allegation Nine: Defendant Heiss violated Plaintiff's Eighth Amendment rights because he ignored Plaintiff's complaints about his safety and the conditions at RCI (¶45)</u>

The final claim identified by Defendants is an Eighth

Amendment claim against Mr. Heiss.  As they explain it, Mr. Brown
contends that he complained about his safety and conditions to
Mr. Heiss, including complaining about being housed with a
Christian Separatist.  With respect to this latter allegation
specifically, Defendants contend that Mr. Brown has not stated a
claim for failure to protect.  Mr. Brown does not address this
claim directly in his response.

The Court agrees that Mr. Brown has not stated any claim
against Mr. Heiss in Paragraph 45.  The standard for a failure to
protect claim has been set forth above.  Here, as with his
earlier claim, Mr. Brown has not set forth any allegations
suggesting that Mr. Heiss was aware of any immediate threat of
harm to Mr. Brown.  Mr. Brown also alleges that he complained to
Mr. Heiss about various conditions and Mr. Heiss did not respond
to his complaints.  The way in which Mr. Brown frames this
allegation suggests that he believed Mr. Heiss had some authority
to remedy the alleged conditions and did not.  Again, as
explained above, supervisory liability under §1983 does not
attach when it is premised on a mere failure to act; it must be
based on active unconstitutional behavior.  Shehee v. Luttrell,
199 F.3d 295, 300 (6th Cir. 1999).  For these reasons, the motion
for judgment on the pleadings will be granted as to any claims
contained in Paragraph 45 directed to Mr. Heiss.

### III.  Director Mohr's Motion to Dismiss

Director Mohr has filed a motion to dismiss setting forth
similar arguments to those raised above.  That is, he contends
that Mr. Brown is not entitled to injunctive relief because he is
no longer incarcerated at RCI.  Further, Director Mohr argues
that any claims against him in his official capacity are barred
by the Eleventh Amendment.  He also interprets Mr. Brown's
complaint as alleging his involvement in four specific claims and

contends that he is entitled to qualified immunity on these
claims.  In addition to these arguments, he asserts initially
that the claims against him must be dismissed in accordance with
Rule 12(b)(5) because he was not timely served.

In response, Mr. Brown again takes issue with every point
raised by Director Mohr.  Mr. Brown's position will be set forth,
as necessary, below.

## A.  Legal Standard

Fed.R.Civ.P. 12(b)(6) provides that the Court may, upon
motion, dismiss a claim for relief asserted in any pleading for
failure to state a claim upon which relief can be granted.
Fed.R.Civ.P. 8(a) requires the party pleading a claim for relief
to make a "short and plain statement of the claim showing that
the pleader is entitled to relief."  When evaluating such a claim
in the context of a Rule 12(b)(6) motion, the Court must
ordinarily accept as true all of the well-pleaded factual
allegations of the complaint.  However, Rule 8(a) has been
interpreted to require that the pleader allege "more than labels
and conclusions, and a formulaic recitation of the elements of a
cause of action will not do ...."  Bell Atlantic v. Twombley, 550
U.S. 544, 555 (2007).  Moreover, the factual allegations
themselves "must be enough to raise a right to relief above the
speculative level ...."  Id.

Twombley established a test of "facial plausibility,"
replacing the prior standard, announced in Conley v. Gibson, 355
U.S. 41 (1957), under which a complaint was able to withstand a
motion to dismiss if there were any possibility that the pleader
could prove a viable claim for relief.  Expanding upon Twombley's
"facial plausibility" test, the Supreme Court, in Ashcroft v.
Iqbal, 129 S.Ct. 1937, 1949 (2009), held that "[a] claim has
facial plausibility when the plaintiff pleads factual content
that allows the Court to draw a reasonable inference that the

-45-

defendant is liable for the misconduct alleged." _Iqbal_ reiterated the principle that legal conclusions, couched as factual allegations, need not be accepted as true, and that the mere recital "of the elements of a cause of action, supported by mere conclusory statements," cannot save a claim from dismissal under Rule 12(b)(6). _Id_. at 1950. Further, _Iqbal_ allows the reviewing court "to draw on its judicial experience and common sense" when deciding if it is plausible that the pleader can, based on the facts alleged, obtain any relief. _Id_. It is still true, however, that _pro se_ complaints are construed liberally in favor of the pleader, even though they, too, must satisfy the "facial plausibility" standard articulated in _Twombley_. _See_ _Haines v. Kerner_, 404 U.S. 519 (1972); _Stanley v. Vining_, 602 F.3d 767, 771 (6th Cir. 2010); _see also Erickson v. Pardus_, 551 U.S. 89 (2007). It is with these standards in mind that the instant motion will be decided.

C. <u>Analysis</u>

The Court will turn first to Director Mohr's argument that he was not timely served. Rule 12(b)(5) provides that a complaint may be attacked for insufficient service or process. A motion under that Rule is the proper vehicle for challenging the failure to deliver a summons and complaint in accordance with Rule 4(m). Under Rule 4(m), the Court has discretion to dismiss the action or, if a plaintiff shows good cause, to extend the time for service.

The Court has addressed the issue of service more than once throughout the duration of this action. Those discussions explained the status of attempts at service in detail, and, at various times, granted Mr. Brown's requests for extensions of time for service. That discussion will not be repeated here. Rather, for the reasons readily apparent from a review of the Court's docket and its previous opinions, the Court concludes

-46-

that Mr. Brown has demonstrated good cause for the delay in
serving Director Mohr.  In short, this delay was not the result
of Mr. Brown's lack of diligence or neglect.  Further, Director
Mohr has not cited any prejudice he has suffered from the delay.
For these reasons, the Court will not recommend that Director
Mohr's motion to dismiss be granted on the basis of Rule
12(b)(5).

Next, to the extent that Mr. Brown seeks injunctive relief
or money damages against Director Mohr in his official capacity,
those claims will be dismissed for the same reasons explained
above in connection with the motion for judgment on the
pleadings.

D.  <u>Remaining Claims Identified by Director Mohr</u>

1.  <u>Allegation One: Conditions of Confinement in the Supermax
Cell against Director Mohr ¶¶19-20)</u>

Director Mohr contends that he did not force Mr. Brown to
endure unsafe conditions of confinement at RCI.  He asserts the
same arguments as the other defendants on this issue - that these
allegations relate to conditions at SOCF and that Mr. Brown has
failed to meet the pleading standards for a conditions of
confinement claim.  Specifically, Director Mohr explains that Mr.
Brown does not allege that he was aware of a substantial risk of
serious harm to Mr. Brown.  Director Mohr asserts that Mr. Brown
only alleges that he complained to Director Mohr.  In response to
this argument, Mr. Brown contends that these paragraphs explain
that he complained about these conditions to Director Mohr.

Allegations of direct involvement in constitutional
deprivations, rather than attempts to impose liability by virtue
of the doctrine of *respondeat superior*, are necessary in order to
hold an individual defendant liable under §1983.  <u>Monell v.
Department of Social Services</u>, 436 U.S. 658 (1978).  Although
there are other legal claims that can properly be asserted

-47-

against a supervisor simply because someone under his or her supervision may have committed a legal wrong, liability for constitutional deprivations under 42 U.S.C. §1983 cannot rest on such a claim. Consequently, unless the plaintiff's complaint affirmatively pleads the personal involvement of a defendant in the allegedly unconstitutional action about which the plaintiff is complaining, the complaint fails to state a claim against that defendant and dismissal is warranted. See also Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984). This rule holds true even if the supervisor has actual knowledge of the constitutional violation as long as the supervisor did not actually participate in or encourage the wrongful behavior. See Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999) (prison officials cannot be held liable under §1983 for failing to respond to grievances which alert them of unconstitutional actions); see also Stewart v. Taft, 235 F.Supp.2d 763, 767 (N.D. Ohio 2002) ("supervisory liability under §1983 cannot attach where the allegation of liability is based upon a mere failure to act").

Mr. Brown's allegations relating to any conditions of confinement claim he is attempting to assert against Director Mohr indicate that the basis for Director Mohr's alleged liability arises strictly from his supervisory role as ODRC Director and not because he had any personal involvement in the alleged conditions. Consequently, the Court will recommend that Director Mohr's motion to dismiss be granted as to this claim.

2. Allegation Two: Denial of access to the courts by withholding legal documents and mail, denying access to court-appointed lawyer, denying access to the phone, denying access to a law library, denying stamps and legal supplies, denying a pen and paper, denying law books by Director Mohr (¶21)

Director Mohr contends again that he cannot be held liable under the theory of respondeat superior and that Mr. Brown has not alleged an actual injury sufficient to state an access to the

courts claim. In response, Mr. Brown contends that he was
prevented from pursuing certain non-specific forms of litigation
and that he has asserted that various ODRC policies
unconstitutionally limit his right of access to the courts
including the property policy and various "indigent policies"
that essentially require him to choose between medication,
laundry, and phone calls and accessing the courts.

As explained above, Mr. Brown has not stated a claim for
denial of access to the courts. As a result, to the extent that
Mr. Brown is seeking to hold Director Mohr liable for policies
that impact that right, he has not stated a claim against
Director Mohr. Consequently, the Court will recommend that
Director Mohr's motion to dismiss be granted as to this claim.

3.  Allegation Three: Director Mohr violated Plaintiff's Eighth
     Amendment right to be free from torture (¶25)

Director Mohr raises the same issues in his motion to
dismiss that the Defendants above raised in connection with their
motion for judgment on the pleadings. A review of this Paragraph
indicates that the only allegation relating to Director Mohr is
that Mr. Brown wrote to him for help and Director Mohr did not
respond. This suggests again that Mr. Brown is attempting to
hold Director Mohr liable solely on the basis of his supervisory
role as ODRC Director. As with Mr. Brown's other claims against
Director Mohr asserted on this basis, the Court will recommend
that the motion to dismiss be granted as to any claim against
Director Mohr set forth in Paragraph 25.

4.  Allegation Four: Director Mohr was deliberately indifferent
     to Plaintiff's medical needs (¶36)

In Paragraph 36, Mr. Brown contends that Director Mohr
violated his Eighth Amendment rights because medication, access
to specialist care, access to institutional doctors, and access
to over the counter medications have been cut. Further, Mr.
Brown asserts that many of his medications were discontinued when

-49-

Director Mohr took them off the formulary.  Director Mohr
contends that he was not deliberately indifferent to Mr. Brown's
medical needs under the Eight Amendment.  Consistent with the
Defendants' approach in connection with the motion for judgment
on the pleadings, Director Mohr relies on Ms. Cardaras' affidavit
in support of his motion.

The allegations directed to Director Mohr in Paragraph 36
relate to Mr. Brown's second period of incarceration at RCI.
Beyond these allegations, Mr. Brown asserts in Paragraph 41 that
Director Mohr has instituted policies and procedures that have
been harmful to Mr. Brown's health and resulted in the denial of
medical treatment.  Construing these allegations liberally at the
pleading stage, they are sufficient to state a claim against
Director Mohr in his individual capacity for allegedly
instituting policies that have deprived Mr. Brown of his
constitutional rights under the Eighth Amendment relating to
medical care.  See Monell, 436 U.S. at 690.

As explained above, the Court will not consider Ms.
Cardaras' affidavit in connection with Mr. Brown's claim of
deliberate indifference to his medical needs.  Similar to the
other Defendants, because Director Mohr contends only that Mr.
Brown was not denied medical care in violation of his Eighth
Amendment rights, he has not addressed the second prong of a
qualified immunity argument.  Moreover, that the deliberate
indifference to an inmate's serious medical need violates the
Eighth Amendment was well-established by the relevant time
period.  See Estelle v. Gamble, supra.  Consequently, the Court
will recommend that the motion to dismiss be denied as to Mr.
Brown's Eighth Amendment claim against Director Mohr.

### IV. Remaining Motions

#### A.  Mr. Brown's Motion to Appoint Counsel

Mr. Brown has filed another motion seeking the appointment

-50-

of counsel.  This motion is 15 pages in length and raises a number of issues that Mr. Brown contends demonstrate his need for counsel.  These issues include his indigence, his imprisonment in a supermax facility, the nature of his claims, his difficulties with receiving legal mail, and his various disabilities and health issues.

There is no right to counsel in prisoner civil rights cases.  Glover v. Johnson, 75 F.3d 264, 268 (6th Cir. 1996).  Rather, such appointment of counsel "is a privilege that is justified only by exceptional circumstances." Lavado v. Keohane, 992 F.2d 606 (6th Cir. 1993).  Courts, in evaluating whether the appointment of counsel is warranted, "generally examine the nature of the case, the plaintiff's ability to prosecute the case in a pro se capacity, and the 'complexity of the factual and legal issues involved.'" Shavers v. Bergh, 516 Fed. Appx. 568, 571 (6th Cir. 2013), quoting Lavado, 992 F.3d at 606.

Mr. Brown has not demonstrated that this is an exceptional case necessitating the appointment of counsel.  Despite Mr. Brown's litany of issues which he believes warrants the appointment of counsel, he has adequately represented himself to date in this case and other cases filed in this Court.  A review of not only the motion itself, but his numerous and frequently extremely lengthy filings, indicates his active prosecution of this action, his understanding of the issues he is raising, his obligation to respond to Defendants' various filings, and his ability to articulate his position.  Consequently, the motion to appoint counsel will be denied.

        B.  <u>Mr. Brown's Motion for Leave to Amend</u>

Mr. Brown has moved for leave to amend his complaint to name Dr. Eddy as a defendant in this case.  According to Mr. Brown, Dr. Eddy was named as a defendant in the original and the second amended complaint.  He contends that his current complaint

-51-

contains claims against Dr. Eddy in Paragraphs 33 and 36-41.  He explains that it was always his intent to name Dr. Eddy as a defendant here, but that he simply forgot to include Dr. Eddy in his list of defendants set forth in his third amended complaint. This motion is unopposed.

Some history of Mr. Brown's filings is necessary here.  On August 26, 2013, Mr. Brown sought leave to file an amended and supplemented complaint (Doc. 26).  This motion specifically stated:

> In the instant case, the plaintiff wants to amend the suit to reflect his errors in the suit concerning the capacities of those he sued, to include dates and times once he receives his grievance files and medical records, add John Does' names and clarify the original complaint.
>
> ... Additionally, the plaintiff's rights under the Constitution continue to be violated by the same defendants' after he was transferred back to Ross Correctional in March of 2013 from Southern Ohio Correctional.  He request[s] leave to include a supplemental complaint over the denial of his rights to:
>
> 1) Medical care and constitutional medical policy and procedure
>
> 2) Denial of the right to access the courts and policy and procedures that deny copies, postage - and indigent status
>
> 3) Retaliation for exercise of constitutional rights
>
> 4) Totallity (sic) of conditions at Ross Correctional
>
> 5) Stolen and lost property deliberatly (sic) done by the State Corrections Personel (sic).

On August 30, 2013, certain defendants moved for a more definite statement (Doc. 27).  Mr. Brown's motion to amend was granted and the motion for a more definite statement was denied

as moot by order dated March 28, 2014 (Doc. 49). The order
stated:

> ... With respect to the motion for leave to amend, the
> Court notes that Mr. Brown has not provided a proposed
> amended complaint for the Court's review. He has,
> however, described his intended amendments and his
> motion is unopposed. Consequently, the motion for
> leave to amend (Doc. 26) is granted. Mr. Brown shall
> file an amended complaint consistent with the
> representations in his motion within 28 days of the
> date of this order.

On April 11, 2014, Mr. Brown filed his amended complaint
which he captioned as a second amended complaint. The defendants
moved to strike that pleading on April 25, 2014 (Doc. 52). The
basis for that motion was Mr. Brown's failure to amend his
complaint in accordance with previous Court orders.

By order dated November 6, 2014 (Doc. 92), the Court granted
defendants' motion to strike that pleading. In striking the
second amended complaint, the Court stated:

> ...in granting Mr. Brown leave to file an amended
> complaint, this Court specifically directed that his
> amended complaint conform to the representations in his
> motion for leave. Mr. Brown's motion for leave raised
> issues relating to conditions at Ross Correctional
> Institution only. Mr. Brown's amended complaint naming
> defendants and raising issues relating to SOCF is
> inconsistent with the Court's instruction. Further,
> the Court in Case No. 1:12-cv-583 specifically retained
> the claims relating to SOCF and transferred only the
> remaining claims involving conditions at RCI or those
> involving ODRC employees located in Columbus.
> Consequently, the Court will grant the defendants'
> motion and will strike the amended complaint for Mr.
> Brown's failure to comply with this Court's orders.
> Mr. Brown will be directed to file an amended complaint
> in this case which complies with the terms of the
> Court's previous orders. See Docs. 12 and 49 in Case
> No. 1:12-cv-583 and Doc. 49 in Case No. 2:13-cv-06.
> His failure to do so may result in a recommendation
> that this case be dismissed for Mr. Brown's failure to
> comply with the Court's orders.

-53-

The Court directed Mr. Brown to file another amended complaint
within fourteen days of the date of the order.

Mr. Brown filed his third amended complaint on September 11,
2015 (Doc. 132) and defendants moved to dismiss.  In the Report
and Recommendation and Order issued on December 17, 2015 (Doc.
139), the Court noted:

> This brings the Court to Dr. Eddy.  Mr. Brown does
> not include Dr. Eddy in his list of named defendants
> although multiple allegations in the complaint are
> directed to him.  Dr. Eddy, however, was not named as a
> defendant in any of the claims transferred to this
> Court.  Further, Mr. Brown did not seek leave to name
> Dr. Eddy as a defendant.  Consequently, the Court will
> not construe the complaint as naming Dr. Eddy as a
> defendant.

In seeking leave to amend to file a second amended
complaint, Mr. Brown did not indicate his intention to name Dr.
Eddy as a defendant and, therefore, he was not granted leave to
do so.  To the extent he did so in is second amended complaint,
that complaint has been stricken.  Consequently, to the extent
that Mr. Brown has included claims against Dr. Eddy in his third
amended complaint, as indicated, he has done so without leave of
Court.  The question raised by Mr. Brown's current motion then is
whether, at this point, leave to amend should be granted to allow
Mr. Brown to name Dr. Eddy as a defendant.

Fed.R.Civ.P. 15(a)(2) states that when a party is required
to seek leave of court in order to file an amended pleading,
"[t]he court should freely give leave when justice so requires."
The United States Court of Appeals for the Sixth Circuit has
spoken extensively on this standard, relying upon the decisions
of the United States Supreme Court in <u>Foman v. Davis</u>, 371 U.S.
178 (1962) and <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>,
401 U.S. 321 (1971), decisions which give substantial meaning to

-54-

the phrase "when justice so requires."  In <u>Foman</u>, the Court
indicated that the rule is to be interpreted liberally, and that
in the absence of undue delay, bad faith, or dilatory motive on
the part of the party proposing an amendment, leave should be
granted.  In <u>Zenith Radio Corp.</u>, the Court indicated that mere
delay, of itself, is not a reason to deny leave to amend, but
delay coupled with demonstrable prejudice either to the interests
of the opposing party or of the Court can justify such denial.

Applying the liberal standard above to the current scenario,
the Court will grant the motion for leave to amend the complaint
to include Dr. Eddy.  As exhibited by the chronology of events
explained above, the Court cannot conclude that Mr. Brown has
moved to name Dr. Eddy as a defendant for purposes of delay or in
bad faith.  Further, as noted, this motion is unopposed so
Defendants have failed to set forth any prejudice they will
suffer if this motion is granted.

C.  Mr. Brown's Motions to "Reserve" Defendants

This brings the Court to yet another issue relating to
service in this case.  Mr. Brown has three pending motions
relating to service issues.  The first motion seeks to re-serve
Austin Stout and Greg Trout, contending that these Defendants
were served at the ODRC but the summonses came back unexecuted
because they no longer work there.  Mr. Brown asks the Court for
an order directing the United States Marshal or defense counsel
to obtain current addresses for Mr. Stout and Mr. Trout and
directing the U.S. Marshal to attempt service again.  Further, he
explains that the Marshal mistakenly attempted to serve Director
Mohr at RCI, so he requests that service on Director Mohr be
attempted again.  This motion (Doc. 155) is moot because Director
Mohr has now been served and Mr. Brown has filed a second motion
to attempt service on Mr. Trout and Mr. Stout and has provided
what he has characterizes as their current addresses.

-55-

Consequently, this motion will be denied on that basis.

Mr. Brown's second motion seeks an order directing that service be attempted on Nurse Smith at her current address. According to this motion, following the Court's most recent order, the Marshal served Nurse Smith at RCI even though she no longer works there. Mr. Brown explains that, prior to this attempted service at RCI, the Defendants provided her current address to the Court, the U.S. Marshal, and him. He believes that the Marshal's Office should have the correct address and that it is part of the record in this case. He is unable to provide it because it was "taken [from him] and destroyed by the defendants." If his belief is untrue, he requests that the Court order defense counsel to provide Nurse Smith's correct address again.

A review of the Court's docket indicates that a summons was originally issued to Nurse Smith at RCI on May 14, 2013 (Doc. 17). On May 21, 2013, the summons was returned executed as to Nurse Smith (Doc. 18). On May 29, 2013, the summons was returned unexecuted as to Nurse Smith accompanied by a letter explaining that there was no Nurse Smith at RCI (Doc. 21).

On December 11, 2013, Mr. Brown filed a motion requesting that service be attempted again on several defendants, including Nurse Smith (Doc. 41). By Report and Recommendation and Order dated April 29, 2014 (Doc. 53), the Court directed the Defendants to provide the U.S. Marshal Service with the last known address for Nurse Smith. On May 16, 2014, Defendants filed a notice with the Court stating "that on May 9, 2014, they provided the last known address of Defendant Smith to the United States Marshals." See Doc. 61. They did not include the address in the notice.

The Court's Report and Recommendation and Order (Doc. 53) also had directed Mr. Brown to complete service on various defendants, including Nurse Smith, within 14 days of the date of

the order.  Mr. Brown quickly sought an extension of time for service on these defendants (Doc. 56).  This motion was ultimately denied as moot by order dated November 6, 2014 (Doc. 92), striking Mr. Brown's second amended complaint, directing him to file a third amended complaint, and allowing him 30 days after the filing of his third amended complaint to properly serve the defendants.

Shortly after this order, Mr. Brown filed a motion for an extension of time to file his third amended complaint (Doc. 98).  This motion was granted by order dated February 23, 2015 (Doc. 108), and directed Mr. Brown to file his third amended complaint within 30 days of the Court's ruling on objections to the Report and Recommendation and motion for reconsideration.  The Court issued its order ruling on the objections and motion for reconsideration on May 13, 2015 (Doc. 123), and directed Mr. Brown to file his third amended complaint as previously ordered.  Almost immediately, Mr. Brown filed a motion for an extension of time to file his third amended complaint (Doc. 124).

On July 10, 2015, Mr. Brown filed a motion for an order to serve the third amended complaint and attached a copy of that pleading to the motion (Doc 128).  On September 11, 2015, he filed his third amended complaint as a stand alone document (Doc. 132).  Defendants filed a motion to dismiss the third amended complaint on October 9, 2015 (Doc. 135).  The Court issued a Report and Recommendation and Order on December 17, 2015 (Doc. 139), in which it directed the Clerk to prepare and finalize summonses for defendants Nurse Smith, Ryan Dolan, Ed Voorhies, Director Mohr, Austin Stout, Greg Trout, and Trevor Clark.  A summons issued to Nurse Smith at RCI was returned unexecuted on January 27, 2016.  Mr. Brown filed his current motion to re-serve Nurse Smith shortly thereafter.  It is unopposed.

In light of all of the above, Mr. Brown's motion to re-serve

-57-

Nurse Smith will be granted.  Defense counsel is directed to
again provide Nurse Smith's last known address to the Court
within ten days of the date of this order.

Mr. Brown's third motion seeks service on Defendants Trout
and Stout at their current addresses, which he has now provided.
This motion also is unopposed.  Much of the above discussion
relating to Nurse Smith also applies to these Defendants.
Consequently, the motion to re-serve Defendants Trout and Stout
will be granted.

### D.  Defendants' Remaining Motions

Defendants have moved for a stay of discovery pending a
resolution of the motion for judgment on the pleadings.  Further,
they have moved for an extension of time to file a reply in
support of that motion.  In light of this Report and
Recommendation and because the Defendants have already filed
their reply, these motions are moot and will be denied on that
basis.

### V.  Recommendation and Order

For the reasons stated above, the Court recommends that the
motion for judgment on the pleadings (Doc. 161) be granted in
part and denied in part.  The motion for judgment on the
pleadings is denied as to Mr. Brown's claims against Ms. Upchurch
set forth in Paragraph 22, denied as to a retaliation claim
against Warden Jeffries, denied as to an Eighth Amendment claim
directed to Dr. Krisher for the alleged denial of medical care
during Mr. Brown's second incarceration at RCI, and denied as to
the Eighth Amendment claim against Warden Jeffries to the extent
that Defendants have relied on the doctrine of res judicata.  The
motion for judgment on the pleadings is granted in all other
respects as it relates to Defendants Whitten, Heiss, Seacrest and
Dolan and any other claims directed to Warden Jeffries, Dr.
Krisher or Ms. Upchurch. It is further recommended that the

-58-

motion to dismiss (Doc. 173) be granted in part and denied in part.  The motion is denied as to Mr. Brown's Eighth Amendment claim relating to medical care and granted in all other respects. Further, it is ordered that the motion to reserve defendants (Doc. 155), the motion to stay discovery (Doc. 162) and the motion for an extension of time (Doc. 174) are denied as moot. The motion for appointment of counsel (Doc. 160) is denied.  The motion to amend the complaint (Doc. 158) is granted.  Finally, the motions to re-serve defendants Stout, Trout and Nurse Smith (Docs. 156 and 159) are granted.  Defense counsel shall provide Nurse Smith's last known address to the Court within ten days.

### PROCEDURE ON OBJECTIONS TO REPORT AND RECOMMENDATION

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir.1981).

### MOTION FOR RECONSIDERATION OF ORDER

Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge.  28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 14-01, pt. IV(C)(3)(a).  The motion must specifically designate the order or part in question and the basis for any objection. Responses to objections are due fourteen days after objections are filed and replies by the objecting party are due seven days thereafter.  The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect even if a motion for reconsideration has been filed unless it is stayed by either the Magistrate Judge or District Judge.  S.D. Ohio L.R. 72.3.


                                    /s/ Terence P. Kemp
                                    United States Magistrate Judge